UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                          )
            v.            )      CRIMINAL NO. 03-10350-RCL
                          )
HABEEB ADEOLA AZEEZ       )

## OPPOSITION OF THE UNITED STATES TO
## DEFENDANT HABEEB ADEOLA AZEEZ'S MOTION TO SUPPRESS

I.    INTRODUCTION

Defendant Habeeb Adeola Azeez ("Azeez") has filed a motion to suppress the fruits of a border search of his luggage ("Azeez Motion"). Specifically, Azeez moves for the suppression of approximately 1.3 kilograms of heroin discovered inside the railings and handles of his two suitcases on the basis that the seizure was made pursuant to a "non-routine" search for which the government lacked reasonable suspicion. Motion at 2-4. Azeez claims that the search was rendered non-routine because the Customs officials conducting the search allegedly "drilled" into the suitcases. Id. This claim has no merit.

As argued more fully below, the evidence at issue was seized during the course of a routine border inspection, as the drugs were discovered without any "drilling" or any other actions that could reasonably be construed as transforming the inspection of Mr. Azeez's luggage from a routine to a non-routine border search. Moreover, even if the disputed search could be considered nonroutine, the

circumstances leading to the discovery of the illegal

narcotics provided the officials executing the search with

reasonable articulable suspicion that the luggage contained

contraband.  Accordingly, Azeez's motion to suppress should

be denied.

## II.  STATEMENT OF FACTS[1]

Azeez arrived at Logan Airport on Saturday, October 18,

2003, aboard Lufthansa Airlines Flight 422 from Frankfurt,

Germany.  McGrath Aff., ¶ 3.  Upon the flight's arrival,

Azeez deplaned with the other passengers in Terminal E,

which is designated for the arrival of international

flights, and presented himself at the "Unified Primary" area

on the second level of the terminal, where all international

passengers are required to produce their travel documents.

Id.  The inspector who inspected Azeez's travel documents

noticed that Azeez had been linked in the Customs "TECS"

computer system to a Nigerian heroin swallower who had been

apprehended at Los Angeles International Airport four months

earlier.  Accordingly, the inspector designated Azeez for a

secondary Customs inspection.  Id.  The inspector also

---

[1]     The following facts are based upon the Affidavit of Senior
Inspector James P. McGrath of the United States Department of
Homeland Security, Customs and Border Protection ("CBP").
Inspector McGrath's Affidavit is attached hereto as Exhibit A,
and is cited herein as "McGrath Aff., ¶ __ ."

2

placed the notation "possible TECS match" into the TECS computer system.  Id.

Senior Inspector McGrath first encountered Azeez, as Azeez approached the exit to the U.S. Customs area on the ground level of Terminal E, where he conducted a secondary inspection of Azeez.  Id., ¶ 4.  First, Inspector McGrath asked Azeez to place his luggage on an inspection table.  In response, Azeez removed two identical bluish green suitcases from a push cart (hereinafter "Bag #1" and "Bag #2") and placed them on the table in front of Inspector McGrath.  Id. Inspector McGrath asked Azeez how long he had owned the suitcases, and Azeez replied that he had purchased them the previous day.  Id.  Inspector McGrath inspected the claim tags produced by Azeez (upon which the name "Azeez" was printed) and determined that they matched the baggage tags affixed to the two suitcases.  Id.  Inspector McGrath then conducted a physical examination of the suitcases.

Inspector McGrath did not notice anything unusual about the interior of the bags -- Bag #1 was filled with African-style clothing and other personal effects, and Bag #2 was filled with various foodstuffs.  Id., ¶ 5.  However, Inspector McGrath noticed that the retractable handles connected to the wheeling mechanism on each suitcase neither fully extended outward, nor extend evenly.  He also noticed

3

that the retractable trays on the bottom of each suitcase
(which are designed to extend outward to hold additional
luggage) did not extend at all.  Id.  While he examined the
suitcases, Inspector McGrath asked Azeez about the purpose
of his visit to the United States, and Azeez stated that he
had come to visit his daughter.  Id.  Azeez also stated that
he had another daughter who lived in Los Angeles, whom he
had visited in May, 2003, but that he had no other relatives
in the United States.  Id.

     At this point, Inspector McGrath queried the TECS
computer system and learned the reason Azeez had been
referred for secondary inspection, i.e., that Azeez and a
Nigerian internal body carrier both had provided the same
fictitious address to Customs officials at Los Angeles
International Airport.  Id., ¶ 6.  Shortly thereafter, CBP
Inspector John Galvin came to assist Inspector McGrath.  Id.
Inspector Galvin took Azeez's Customs Declaration and
reviewed the TECS record on Azeez.  Upon noticing in the
TECS record that Azeez and the internal courier from Los
Angeles were linked through the use of the same fictitious
address, Inspector Galvin used the internet website
"Mapquest" to query the address on Azeez's present Customs
Declaration -- "3504 Midfield Way, Boston."  Id.  The

Mapquest inquiry indicated that this address did not exist in Boston, Massachusetts.  Id.

Inspector McGrath and Inspector Galvin then stepped approximately five feet away from Azeez to discuss their respective findings.  Id., ¶ 7.  While the inspectors were engaged in this discussion, Azeez attempted to remove his suitcases from the inspection table and place them back onto his push cart.  Id.  Upon noticing this, Inspector McGrath advised Azeez to leave the luggage on the table.  Id.  Inspector Galvin then questioned Azeez about the address on his Customs Declaration, specifically inquiring about where in Boston the address existed.  Azeez replied that he was not sure, and that the address could be either in Boston or Houston.  Id., ¶ 8.  Inspector Galvin then asked Azeez who was coming to pick him up at the airport, and Azeez replied that his brother-in-law was coming.  Id.  The inspectors again stepped away from Azeez to discuss the situation, and during this subsequent conversation, Azeez again attempted to remove the suitcases from the inspection table, and Inspector McGrath again advised him to leave the suitcases where they were.  Id.

Shortly thereafter, Inspectors Thomas Harrington and Michael Sweeney came to assist in the inspection.  Id., ¶ 9.  Inspector McGrath notified the other inspectors that the

handles at the top of the suitcases did not extend properly, and that the pullout trays at the bottom of the suitcases did not extend at all. Id. He then removed the contents from each suitcase; provided Bag #1 to Inspector Harrington and Bag #2 to Inspector Sweeney; and asked the inspectors to x-ray the suitcases. Id. The inspectors performed an x-ray and a physical examination of each suitcase. Id. The x-rays results were inconclusive, as was Inspector Harrington's physical examination of Bag #1.

However, Inspector Sweeney, during his physical examination of Bag #2, found cause to believe that one of the metal railings on the bottom of that suitcase had been tampered with. Id. Specifically, Inspector Sweeney observed that there were two identical metal railings at the bottom of the suitcase, which extended from the front of the suitcase (where there was an auxiliary tray for carrying of additional luggage) to the rear of the suitcase (where the wheeling mechanism was located). He also noticed that one of these railings was missing a plastic plate at its base that should have connected the railing to the suitcase's wheeling mechanism. Id. As such, the lower end of the railing was unattached at the bottom and appeared to have been tampered with. Id. Inspector Sweeney grabbed this railing with his hand, and, with "minimal effort," pulled it

6

away from the bottom plate of the suitcase.  The top portion
of the railing remained connected.  Id.

Inspector Sweeney pulled the railing out far enough to
notice that a small, thin piece of plastic had been stuffed
approximately one-quarter (1/4) inch into it.  Id., ¶ 10.
Upon removing the piece of plastic, the inspectors saw that
the interior of the railing had been hard-packed with a
white powdery substance.  Id.  This substance was field
tested, and yielded a positive result for the presence of
opiate alkaloids, which is consistent with heroin.  Id.
Upon this discovery, the inspectors used a combination of a
screwdriver and a hammer to remove the plastic plate
covering the other railing, and an inspector used his hand
to pull this second railing away from the wheeling
mechanism.  This procedure revealed more of the same white
powdery substance, which also tested positive for the
presence of heroin.  Id.  At this point, the inspectors used
a combination of a screwdriver, a hammer, a chisel, and a
knife to probe and pry open the other railings and the
handles of both suitcases, which yielded additional white
powdery substances that field tested positive for heroin.
Id.

## III. ARGUMENT

Azeez apparently concedes that the search of his luggage in this case occurred at the functional equivalent of the international border, as his brief relies solely upon cases involving border searches.  See Azeez Motion at 3-4.[2] As such, absent some extraordinary circumstance, the search at issue would be considered "routine" and would not be subject to "any requirement of reasonable suspicion, probable cause, or warrant." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985).  See also United States v. Beras, 183 F.3d 22, 25-26 (1st Cir. 1999) ("[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant.") (quoting Montoya de Hernandez).

However, citing United States v. Robles, 45 F.3d 1 (1st Cir. 1995), Azeez argues that the search of his luggage in this case was "non-routine," because the Customs officials allegedly "disassembled the luggage using a process which

---

[2]    See also Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973) ("[A] search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search."); United States v. Braks, 842 F.2d 509, 512-513 (1st Cir. 1988) (analyzing search of passenger arriving at Logan Airport from Beirut, Lebanon as a "border search"); United States v. Robles, 45 F. 3d 1, 12 (1st Cir. 1995) (defendant conceded that Logan Airport was "the functional equivalent of an international border").

included drilling into the handle." Azeez Motion at 2, 4.[3]
This argument, however, is unavailing. As demonstrated
below, <u>Robles</u> is inapposite to the instant case, as the
Customs officials discovered the heroin in Azeez's luggage
without any "exploratory drilling." Accordingly, no level
of suspicion was required to effect the search.

### A.    The Search of Azeez's Luggage Was a "Routine" Border Search Requiring No Suspicion.

None of the actions taken by the Customs officials
prior to the discovery of the heroin, whether viewed in
isolation or in combination, constituted a "non-routine"
border search. As set forth above, after Azeez placed his
luggage on the secondary inspection table, the sum total of
the ensuing border search consisted of the following: (1)
Inspector McGrath examined the retractable handles and
pullout trays of each suitcase; (2) Inspector McGrath
removed the contents of the suitcases and inspected their
interior linings; (3) Inspectors Sweeney and Harrington took
the suitcases to be x-rayed and conducted their own physical
examinations of the suitcases; and (4) after noticing the
loose railing on Bag #2 that appeared to have been tampered

---

[3]    Azeez also cites <u>United States v. Molina-Tarazon</u>, 297 F. 3d
709 (9th Cir. 2002) as support for this argument. However,
<u>Molina-Tarazon</u> was expressly overruled by the Supreme Court in
<u>United States v. Flores-Montano</u>, 2004 WL 609791 (March 30, 2004),
which is discussed below.

with, Inspector Sweeney used his hand, and with "minimal
effort," pulled the railing away from the base so that he
could see whether the railing contained any contraband.
None of these actions individually, nor in combination,
transformed the inspection of Azeez's luggage into a "non-
routine" border search.

Despite his attempt to distinguish this case from the
Supreme Court's recent decision in United States v. Flores-
Montano, 2004 WL 60971 (March 30, 2004), the search of
Azeez's luggage in this case was no more intrusive than the
border search in that Flores-Montano, which the Court
classified as "routine". Specifically, in that case, while
the defendant's automobile was stopped at a Customs station
on the United States/Mexico border, a Customs official
inspected the vehicle, instructed the defendant to step out
of the car, and the following search of the vehicle's gas
tank ensued:

> [A] second customs inspector inspected the gas
> tank by tapping it, and noted that the tank
> sounded solid. Subsequently, the inspector
> requested a mechanic under contract with Customs
> to come to the border station to remove the tank.
> Within 20 to 30 minutes, the mechanic arrived. He
> raised the car on a hydraulic lift, loosened the
> straps and unscrewed the bolts holding the gas
> tank to the undercarriage of the vehicle, and then
> disconnected some hoses and electrical
> connections. After the gas tank was removed, the
> inspector hammered off bondo (a putty-like
> hardening substance that is used to seal openings)

10

> from the top of the gas tank. The inspector opened
> an access plate underneath the bondo and found 37
> kilograms of marijuana bricks. The process took 15
> to 25 minutes.

2004 WL 609791 at 2.

Relying heavily upon <u>United States v. Molina-Tarazon</u>,
279 F. 3d 709 (9th Cir. 2002), in which the Ninth Circuit
had decided that the removal and dismantling of a vehicle's
gas tank constituted a non-routine border search, the
defendant in <u>Flores-Montana</u> moved to suppress the marijuana
seized from his vehicle on the basis that the Customs
officials lacked reasonable suspicion to remove the gas tank
from the vehicle for the purpose of conducting the search.[4]
The Supreme Court rejected this argument, declaring: "Time
and time again, we have stated that 'searches made at the
border, pursuant to the longstanding right of the sovereign
to protect itself by stopping and examining persons and
property crossing into this country, are reasonable simply
by virtue of the fact that they occur at the border.'" <u>Id.</u>
at 3 (quoting <u>United States v. Ramsey</u>, 431 U.S. 606, 616
(1977)). Accordingly, noting that "[a] gas tank search
involves a brief procedure that can be reversed without
damaging the safety or operation of the vehicle," the Court

---

[4]    As noted, Azeez also relies upon <u>Molina-Tarazon</u> in his
motion to suppress. <u>See</u> Azeez Motion at 3.

concluded that the act of removing, disassembling and
searching a car's fuel tank is a routine border search
requiring no suspicion.  Id. at 4.

In the instant case, the steps taken by the Customs
officials that led to the discovery of the heroin were far
less intrusive and involved than those taken in Flores-
Montano, which included the calling of a mechanic to the
scene who "loosened" the straps and "unscrewed" the bolts
holding the gas tank, and "disconnected" hoses and
electrical connections.  Flores-Montano, supra at 2.  After
the gas tank was removed, an inspector then "hammered off"
the putty-like hardening substance that had been used to
seal openings of the gas tank.  Id.

By contrast, to expose the heroin secreted within the
railings of Azeez's suitcases, the Customs officials in this
case visually appraised the suitcases; manually manipulated
their handles and pullout trays; removed their contents, ran
them through an x-ray machine; and, after noticing that one
of the railings on Bag #2 (a suitcase that supposedly had
been purchased the previous day) was loose, used "minimal
effort" to manually pull the railing away from the base of
the suitcase (a similar process to the disconnection of the
hoses to gas tank of the vehicle in Flores-Montano).  Once
the railing was separated from the plate and the inspector

12

saw a plastic substance inside of the railing, like the
officer removing the bondo in Flores-Montano, the inspectors
in this case were permitted to remove the plastic to
determine whether it was hiding any contraband.  After the
inspectors observed the heroin concealed in the railing, the
government had probable cause to not only seize both
suitcases, but also to arrest the defendant.  By the same
token, at a minimum, the government also had reasonable
suspicion to disassemble Bag #2 to determine whether the
other railings also contained contraband, and to search Bag
#1 in a similar manner.

### B.  *Robles* Does Not Apply Because No "Exploratory Drilling" or Significant Force Was Used.

As noted above, the main case upon which Azeez relies,
United States v. Robles, is inapposite to the facts of this
case because here, unlike in Robles, the contraband was
discovered without any drilling into the suitcases.[5]  In

---

[5]    Robles involved the border search of a metal cylinder that
had been shipped to the United States from Columbia.  After an x-
ray and a dog sniff both proved inconclusive, the Customs
official drilled a whole into the cylinder, exposing a cache of
marijuana.  Noting that the government had conceded that the
drilling of the cylinder was "non-routine," the court looked to
United States v. Braks, 842 F. 2d 509 (1st Cir. 1988) for the
factors to be considered in determining whether the search at
issue was non-routine.  Robles at 5.  However, the court focused
on one factor only -- whether force was employed -- and finding
that the drilling at issue required the use of force, concluded
that the search in that case was "not a routine search."  Id.

13

Flores-Montano, the Supreme Court rejected a similar

reliance on Robles by the defendant in that case:

> We have no reason at this time to pass on the
> reasonableness of drilling, but simply note the
> obvious factual difference that this case involves
> the procedure of removal, disassembly, and
> reassembly of a fuel tank, rather than potentially
> destructive drilling."

2004 WL 609791 at 4, n.2.  The government contends that the

Supreme Court, thereby expressly limited Robles to cases

involving "potentially destructive drilling."  As such,

given that there was no such drilling (or any drilling at

all, for that matter) in accessing the heroin inside Azeez's

luggage, Robles does not apply to the facts of this case.

Nevertheless, it is anticipated that the defendant will

also argue that the holding in Robles is not limited to

cases involving exploratory drilling, but also is applicable

to any border search in which force is used to conduct the

search.  See, e.g., Azeez's Motion at 4 (arguing that

Azeez's luggage was taken from him and "dismantled with

force").  However, as demonstrated above, prior to the

discovery of the heroin in Bag #2, the only "force" used in

relation to the search of Azeez's luggage was the degree

needed to manually separate the metal railing from the

bottom plate of the wheeling mechanism.  Once the Inspectors

did so, they discovered the plastic inside the railing,

14

which they removed, to expose the heroin Azeez now moves to suppress. The "minimal effort" used to pull the railing from the plate is a far cry from the level of force associated with the drilling carried out in Robles. Thus, the minimal degree of force used to effect the instant search did not give rise to a "non-routine" border search.[6] Accordingly, no level of suspicion was needed to justify the search in this case.

## C. Even If Reasonable Suspicion Were Required That Standard Was Met.

Even if it were the case that the inspectors needed reasonable suspicion in order to search Azeez's suitcases,

---

[6]    In a real sense, almost all border searches of a closed container require the use of some level of force (however minimal) to gain access to the contents of the container (e.g., the unscrewing of a jar to view its contents; the manual opening of the lid of a car's trunk; the breaking of the tape of a closed and sealed carton, etc.). If such minimal levels of force were to be considered in distinguishing routine from non-routine searches, then virtually every border search would be subject to challenge on this basis. The government is unaware of any cases in which the courts have engaged in this type of "hair-splitting" force comparison.

Moreover, United States v. Flores-Montano, supra., supports the conclusion that the force used by the inspectors in this case did not convert the search into a non-routine border search. As noted above, in Flores-Montano, the Court classified as "routine" a border search involving the removal and disassembly of a vehicle's fuel tank, to include the loosening of straps, the unscrewing of bolts, the disconnection of hoses and electrical connections, and the hammering of a putty-like hardened substance from the top of the tank. In this case, the inspectors used far less force.

15

the facts support a finding that the inspectors did, in fact, have reasonable suspicion to believe that Azeez was concealing contraband: (1) the inspectors knew that Azeez and a Nigerian heroin swallower both had provided the same fictitious address to Customs officials at the Los Angeles Airport; (2) the address on the Customs Declaration Azeez presented to Inspector McGrath also appeared to be fictitious; (3) Azeez did not know whether the address on his Customs Declaration was in Boston or Houston; (4) a physical inspection of the two suitcases revealed that the retractable handles and pullout trays on both suitcases -- which Azeez claimed to have purchased the previous day - did not function properly; (5) Azeez repeatedly attempted to remove the suitcases from the inspection table, after being told not to do so; (6) after stating that his two daughters were the only relatives he had in the United States, Azeez later claimed that his brother in law was picking him up at the airport; and (7) one of the railings at the bottom of Bag #2 was missing a plastic plate covering, and appeared to have been tampered with.   See McGrath Aff., ¶¶ 3-10.

Armed with these facts, the Customs officials certainly had reasonable suspicion to pull an already-loosened railing away from the base plate of Bag #2 to determine whether there was any contraband inside the railing.

16

## IV.   **CONCLUSION**

For the foregoing reasons, Azeez's motion to suppress should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

DICKENS MATHIEU
Assistant U.S. Attorney

## **CERTIFICATE OF SERVICE**

This is to certify that I have this 16th day of April, 2004  caused a copy of the foregoing document addressed to Page Kelley to be placed in the mailbox of the Federal Defender Office, which is maintained at the Clerk's Office of the United States District Court for the District of Massachusetts.

DICKENS MATHIEU

17