## AFFIDAVIT OF INSPECTOR JAMES McGRATH

I, Inspector James P. McGrath, depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am a Senior Inspector with the United States
Department of Homeland Security, Customs and Border Protection
("CBP"), and have been so employed since July, 1978.  My duties
include the inspection and processing of people and merchandise
entering the United States.  I have received specialized training
as a CBP Inspector by participating in a twelve-week Basic
Inspector course, and a two-week Senior Inspector course, at the
Customs Basic Enforcement School at the Federal Law Enforcement
Training Center in Glenco, Georgia.  In the course of my duties
as a Customs Inspector, I have participated in thousands of
border searches, which have included hundreds of instances in
which illegal narcotics and other contraband have been seized.

2.    The following facts are either personally known to me,
have been told to me directly by CBP Inspectors John Galvin,
Thomas Harrington, and Michael Sweeney, or became known to me
after I read reports or reviewed other data relating to this
investigation.  This affidavit is submitted for the sole purpose
of establishing the circumstances surrounding the discovery of
heroin inside Mr. Azeez's luggage at Logan International Airport
in Boston, Massachusetts, on October 18, 2003.  As such, the

affidavit does not set forth all the facts developed during the course of this investigation.

**II.  FACTS AND CIRCUMSTANCES**

3.  Mr. Azeez arrived at Logan Airport on Saturday, October 18, 2003, aboard Lufthansa Airlines Flight 422 from Frankfurt, Germany.  Upon the flight's arrival, Mr. Azeez deplaned with the other passengers in Terminal E, which is designated for the arrival of international flights.  Mr. Azeez presented himself at the "Unified Primary" area on the second level of the terminal, where all international passengers are required to produce their travel documents.  The inspector who inspected Mr. Azeez's travel documents noticed that Mr. Azeez had been linked in the Customs "TECS" computer system to a Nigerian heroin swallower who had been apprehended at Los Angeles International Airport. Accordingly, the inspector designated Mr. Azeez for a secondary Customs inspection.  The inspector also placed the remark "possible TECS match" into the TECS computer system.  A copy of the TECS record in question and a copy of Mr. Azeez's Customs Declaration from October 18, 2003 are attached hereto respectively as Exhibits 1 and 2.

4.  I encountered Mr. Azeez shortly after he had collected his luggage and approached the exit to the U.S. Customs area on the ground level of Terminal E, where I conducted a "secondary"

2

inspection of Mr. Azeez to ascertain whether he possessed any contraband.  First, I asked Mr. Azeez to place his luggage on an inspection table.  Mr. Azeez took two identical bluish green suitcases off of a push cart and placed them on the table.  I inspected the claim tags produced by Mr. Azeez (upon which the name "Mr. Azeez" was printed) and determined that they matched the baggage tags affixed to the two suitcases.

5.    I then began to inspect the suitcases.  I did not notice anything unusual about the interior of the bags.  One suitcase (hereinafter "Bag #1") was filled with African-style clothing and other personal effects.  The other suitcase (hereinafter "Bag #2") was filled with various foodstuffs.  I did, however, notice that the retractable handles connected to the wheeling mechanism on each bag did not fully extend outward, that these handles did not extend evenly, and that the retractable trays on the bottom of each suitcase (which, based on my training and experience, I know are designed to extend outward to hold additional luggage) did not extend at all.  This suggested to me that something might be blocking the paths of these devices.  I asked Mr. Azeez how long he had owned the luggage, and he replied that he had purchased the suitcases the day before.  I asked Mr. Azeez about the purpose of his visit to the United States, and Mr. Azeez advised me that he had come to

3

visit his daughter.  In response to my questioning, Mr. Azeez
stated that he had another daughter who lived in Los Angeles,
whom he had visited in May, 2003, but that he had no other
relatives in the United States.

6.  At this point, I queried the TECS computer system and
read the text of Exhibit 1.  After I consulted the TECS record,
CBP Inspector John Galvin came to assist me.  I gave Mr. Azeez's
Customs Declaration to Inspector Galvin, and he in turn reviewed
Exhibit 1.  Upon learning that Mr. Azeez and an internal heroin
courier at the Los Angeles Airport were linked through the use of
the same fictitious address, Inspector Galvin used the internet
website "Mapquest" to query the address on Mr. Azeez's present
Customs Declaration -- "3504 Midfield Way, Boston."  The Mapquest
inquiry indicated that this address did not exist in Boston,
Massachusetts.

7.  I told Mr. Azeez to remain where he was, and Inspector
Galvin and I stepped approximately five feet away from Mr. Azeez
to discuss our respective findings.  I had my back to Mr. Azeez,
and Inspector Galvin was facing him.  During the ensuing
conversation, Inspector Galvin noticed that Mr. Azeez had begun
to remove his suitcases from the inspection table and to place
them back onto his push cart.  I then turned around and advised
Mr. Azeez to leave the luggage on the table.

4

8.     When Inspector Galvin and I had finished our
discussion, Inspector Galvin questioned Mr. Azeez about the
address on his Customs Declaration.  Specifically, Inspector
Galvin asked Mr. Azeez in which part of Boston the address
existed.  Mr. Azeez replied that he was not sure, and that the
address could be either in Boston or Houston.  Inspector Galvin
then asked Mr. Azeez who was coming to pick him up at the
airport, and Mr. Azeez replied that his brother-in-law was
coming.  Inspector Galvin and I stepped away from Mr. Azeez for
the second time and resumed our discussion of the situation.
During this conversation, Inspector Galvin noticed that Mr. Azeez
again was removing the suitcases from the inspection table.
Again, I advised Mr. Azeez to leave the suitcases where they
were.

9.     Shortly thereafter, CBP Inspectors Thomas Harrington
and Michael Sweeney came to assist in the inspection.  After
Inspector Galvin and I advised them of our findings, I then
emptied the two suitcases of their contents, provided Bag #1 to
Inspector Harrington and Bag #2 to Inspector Sweeney, and asked
them to x-ray the suitcases.  The inspectors performed an x-ray
and a physical examination of each suitcase.  Within two minutes,
Inspector Harrington returned with Bag #1 and advised me that his
inspection was inconclusive, i.e., he could not determine whether

5

Bag #1 contained contraband. However, during his physical
examination of Bag #2, Inspector Sweeney noticed that at the
bottom of Bag # 2 there were two identical rails extending from
the front of the suitcase (where there was an auxiliary tray that
did not extend at all) to the rear part of the suitcase (where
the wheeling mechanism was located). Inspector Sweeney further
noticed that one of these rails was missing a plastic plate that
should have connected the railing to the wheeling mechanism. As
such, the lower end of the rail in question was exposed and
appeared to have been tampered with. Inspector Sweeney then
grabbed that railing with his hand, and, as he related to me
afterward, with "minimal effort," pulled it away from the bottom
plate of the suitcase. The top portion of the railing remained
connected to the suitcase.

10. When Inspector Sweeney pulled at the railing in
question, he noticed that it was stopped at the bottom with a
small piece of plastic that had been stuffed approximately one-
quarter (1/4) inch into it. Upon removing the plastic stopper,
Inspector Sweeney noticed that the interior of the railing had
been hard-packed with a white powdery substance. A photograph
depicting the condition of Bag #2 at this stage of the
investigation is attached hereto as Exhibit 3. The substance
inside the railing was field tested, and yielded a positive

6

result for the presence of opiate alkaloids, which is consistent with heroin. Upon this discovery, the inspectors used a combination of a screwdriver and a hammer to pop off the plastic plate that connected the other railing to the bottom plate of Bag #2. With his hand, Inspector Sweeney pulled this second railing from the bottom plate, and upon exposing the interior of that railing and removing a small piece of plastic that had been stuffed into it, noticed that it also contained a white powdery substance. A photograph depicting the condition of Bag #2 at this stage of the investigation is attached hereto as Exhibit 4. The substance from the second railing also tested positive for the presence of heroin. At this point, the inspectors used a combination of a screwdriver, a hammer, a chisel, and a knife to probe and pry open the other railings and the handles of both suitcases, which yielded additional white powdery substances that field tested positive for heroin. These preliminary tests have been corroborated by more extensive testing by the DEA Northeast Laboratory. See DEA-7 report attached hereto as Exhibit 5.

11. At no time during the search described in this Affidavit did I or any of the other inspectors use a drill to access any of the areas inspected during the search.

Signed under the pains and penalties of perjury this 13th day of April, 2004.

JAMES P. McGRATH